# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**PEOPLE, TECHNOLOGY AND PROCESSES, LLC,**

    Plaintiff,

v.                                            Case No.  8:14-cv-1356-T-30EAJ

**SCIENCE APPLICATIONS INTERNATIONAL CORPORATION AND LEIDOS, INC.,**

    Defendants.

_____/

## ORDER

THIS CAUSE comes before the Court upon Plaintiff's Motion for Partial Summary Judgment As to the Issue of Liability of Defendants (Dkt. 52), Defendants' Response thereto (Dkt. 70), and Plaintiff's Reply (Dkt. 77).  The Court, having reviewed the motion, response, reply, record evidence, and being otherwise advised in the premises, concludes that the motion should be denied.

## SUMMARY

This is a breach of contract case related to a federal military contract for the provision of Warfighter Modeling, Simulation, Analysis, and Integration Support to the U.S. Army Space and Missile Defense Command/Army Forces Strategic Command (the "Army").

Contract performance was to occur in the Afghan warzone and the Army's requirements necessarily fluctuated with the pace of the war.

The breach of contract claim relates to Task Order 6 that incorporates by reference Subcontract No. P010107101 (the "Subcontract"). Specifically, Plaintiff People, Technology and Processes, LLC ("PTP") alleges that, under Task Order 6 and the Subcontract, Defendants Science Applications International Corporation and Leidos, Inc. (collectively, "SAIC") ordered from PTP 44 Full Time Equivalent positions ("FTEs")[1] to fulfill a defined number of hours of services over the course of a specific period of performance. PTP contends that SAIC failed to authorize PTP's deployment of the full extent of the FTEs into theater in Afghanistan which precluded PTP from rendering all of the services that were ordered and resulted in a loss to PTP in the amount of at least $4,980,451.43.

PTP moves for partial summary judgment on the issue of SAIC's liability. PTP argues that a plain reading of the Subcontract and Task Order 6 shows that Task Order 6 was an order for a specific quantity of services—or level of effort—to be performed within a definite time period at a definite price. SAIC breached the Subcontract and Task Order 6 when it failed to authorize the full performance ordered in Task Order 6.

The Court concludes that PTP cannot show as a matter of law that SAIC agreed to make a firm, unconditional purchase for 44 FTEs from PTP because the Subcontract and

---

[1] Full Time Equivalents are personnel working 12 hours per day, 7 days per week, and 50 weeks per year in Afghanistan matching the U.S. Force's schedule, for a maximum of 4,200 hours per year.

Task Order 6 are ambiguous on this issue. And SAIC has pointed to evidence suggesting that the parties understood that Task Order 6 did not obligate SAIC to allow PTP to deploy 44 FTEs regardless of the changing conditions in Afghanistan. Accordingly, these issues must be submitted to a jury.

The Court now turns to the relevant facts.

## RELEVANT FACTS[2]

In 2010, SAIC and the Army entered into Contract No.: W9113M-10-D-003 ("Warfighter") for the provision of Warfighter Modeling, Simulation, Analysis, and Integration Support. The scope of Warfighter involved, among other things, modeling tools, system modeling, analysis, defense system hardware and software integration, planning technology integration, data collection and synthesis, space applications technology, architecture development, testing concepts, systems and technology support, and program management in support of U.S. and Coalition Forces in Afghanistan.

Warfighter was an Indefinite Delivery/Indefinite Quantity ("IDIQ") type contract for Level-of-Effort ("LOE") with fixed loaded ceiling or Not to Exceed ("NTE") labor rates. Another government contractor, L-3 Communications, was also awarded a Warfighter prime contract. SAIC and L-3 competed for Task orders under the Warfighter prime contract. During competitions for task orders, SAIC could propose labor rates at or below the NTE rates, but could not exceed them.

---

[2] These facts are interpreted in a light most favorable to SAIC, the non-movant.

On or about October 30, 2011, the Army awarded SAIC prime Task Order 3. In early 2012, PTP approached SAIC regarding the possibility of PTP performing work as SAIC's subcontractor in Afghanistan. At that time, PTP was a subcontractor in Afghanistan for a company called ManTech Sensor Technologies, Inc. The government terminated ManTech's prime contract and PTP was hopeful that it could convince the Army to move some of the work it had been performing under ManTech's prime contract to Warfighter.

Effective February 24, 2012, SAIC and PTP entered into Subcontract No. P010107101 (the "Subcontract"). The Subcontract made PTP a subcontractor under Warfighter and called for the provision of Warfighter Modeling, Simulation, Analysis, and Integration Support on an IDIQ LOE basis. The Subcontract included a schedule of NTE fully loaded labor rates. During competitions for task orders, PTP could propose labor rates at or below the NTE rates but could not exceed them. The Subcontract provided that "[t]he work defined in individual task order statements of work and schedules will be performed on a Fixed Price Indefinite Delivery/Indefinite Quality[3] basis." (Subcontract Schedule A, Specific Terms and Conditions at p. 1 of 54).

PTP and SAIC entered into negotiations for the terms of PTP's first task order ("Task Order 3") that called for the deployment of up to an estimated 14 personnel or FTEs to Afghanistan. On or about June 27, 2012, PTP and SAIC executed Task Order 3 under the Subcontract.

---

[3] According to SAIC, the term "Quality" is an error—it should state "Quantity" because an "Indefinite Quality" contract does not exist. PTP does not dispute this point.

On or about March 7, 2013, the Army issued Task Order Request for Proposals #0007 ("TORP 7") as a follow-on procurement for SAIC's Afghanistan work under Task Order 3. TORP 7 provided an estimate of 49 FTEs in Afghanistan performing Warfighter Modeling, Simulation, Analysis, and Integration Support for the base period of April 6, 2013, through April 5, 2014, as well as for the option period of April 6, 2014, through October 5, 2014.

On April 4, 2013, SAIC and PTP submitted a Technical Management Proposal (the "Proposal") to the Army in response to TORP 7. The Proposal provided that requests would be made to Leonard Goolsby, the Army's Task Order Contracting Officer's Representative ("TOCOR") for Common Access Cards ("CACs") and Letters of Authorization ("LOAs") that would allow SAIC and PTP to deploy specific personnel to Afghanistan. The Proposal also specifically provided that contractor personnel would deploy only after receiving CACs and LOAs from the Army. The Proposal also provided that the TOCOR was to directly communicate the Army's technical directions to PTP's In-Theater Lead, Gregory "Greg" Johnson. SAIC and PTP decided that PTP would fill 90 percent of the FTEs (44) and SAIC would fill 10 percent of the FTEs (5) during the year long period of performance.

On May 17, 2013, prior to the execution of Task Order 6, the Army directly informed PTP that it should deploy only 32 FTEs because it did not require more than that in Afghanistan at that time. PTP complied with the Army's instructions without objection.

On May 22, 2013, PTP and SAIC executed Task Order 6. Task Order 6 Release 1 (Revision 1) does not contain any fixed price amount, other than the fixed labor rates. It

mentions a number of labor hours within the task order ceiling value and the task order award funding amount but both are references to not to exceed amounts. Task Order 6 does not specify the specific labor categories to be deployed.

On June 21, 2013, the Army directly instructed PTP to reduce the number of FTEs in Afghanistan from 32 to 30 and PTP complied with these instructions.

The record reflects that the Army became concerned with PTP's performance. The Army frequently rejected SAIC's efforts to deploy PTP personnel and directed SAIC to increase its in-theater presence and to limit PTP's in-theater presence. PTP was aware that the Army had directed SAIC to replace PTP personnel. For example, on August 22, 2013, the Army instructed SAIC that deployments to Afghanistan would be permitted only if SAIC took over at least 28 percent of the positions. The record reflects that PTP was aware that the Army was directing SAIC to replace PTP personnel with SAIC's personnel.

On October 14, 2013, PTP sent SAIC a proposed manning roster for the remainder of Task Order 6 that reflected that PTP would deploy 27 FTEs in October 2013, 26 FTEs in November 2013, 24 FTEs in December 2013, and 20 FTEs for each remaining month. The roster also reflected which positions were to be eliminated and/or filled by SAIC.

On October 24, 2013, PTP informed SAIC that the initial funding for Task Order 6 would soon be exhausted and that PTP would cease performance if more funding was not released.

On November 1, 2013, PTP asked for permission to deploy two people to Afghanistan. On November 2, 2013, SAIC responded that it would not deploy PTP's personnel to Afghanistan unless the Army issued the order.

On November 4, 2013, SAIC and PTP executed Modification 2 to Task Order 6 that added additional funding in the amount of $9,624,378.82 (for a total funding of $19,204,872.37). Modification 2 did not reference a specific number of labor hours. Further, like the original task order, it did not contain a fixed price or minimum number of labor hours or FTEs.

On January 31, 2014, SAIC notified PTP that the option to extend Task Order 6 for an additional six months would not be exercised. On February 6, 2014, PTP submitted a request for an adjustment to SAIC for additional compensation it claimed it was owed by virtue of SAIC's alleged changes to Task Order 6. This was the first time that PTP submitted a request for an adjustment. This was also the first time that PTP ever indicated to SAIC that it believed a change had been made to the terms of Task Order 6.

On February 21, 2014, SAIC informed PTP that it was denying PTP's request for an adjustment because SAIC had not changed or terminated Task Order 6; rather, SAIC was simply notifying PTP that it would not be exercising the option to extend Task Order 6. This lawsuit then ensued. PTP contends that SAIC agreed to make a firm, unconditional purchase for 44 FTEs from PTP. PTP contends that the Subcontract and Task Order 6 are clear and unambiguous. The Court disagrees.

## **SUMMARY JUDGMENT STANDARD**

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor. *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. The evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual

issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## **DISCUSSION**

PTP's complaint contains one breach of contract claim. The parties agree that the terms of Task Order 6 and the Subcontract must be construed under Virginia law. In general, contract language should be given its plain, every day meaning, and no words or clauses should be treated as meaningless. When an agreement is plain and unambiguous on its face, a court will not look for meaning beyond the instrument itself and the contract may be interpreted as a matter of law. However, if a contract is unclear, outside evidence may be introduced to determine the real agreement between the parties. *See Robinson-Huntley v. George Washington Carver Mut. Homes Ass'n, Inc.*, 756 S.E.2d 415, 418 (Va. 2014). If reasonable people could draw different conclusions from the parol evidence that is presented to determine the parties' intent, then the meaning of the contract is a question of material fact that should be presented to a jury. *See Online Resources Corp. v. Lawlor*, 736 S.E.2d 886, 894 (Va. 2013).

PTP argues that Task Order 6 and the Subcontract are clear to the extent that SAIC agreed to make a firm, unconditional purchase for 44 FTEs from PTP. But a plain reading of Task Order 6 and the Subcontract does not reflect this. To the contrary, the only thing fixed in Task Order 6 is the price, to the extent that the negotiated labor rates were fixed. Tellingly, PTP does not point to a single clause or provision of Task Order 6 that clearly reflects that SAIC was purchasing a fixed volume of services other than fixed hourly rates for various labor categories. The Subcontract at Schedule A, Sections 2.0(a) and (f) provides:

> (a) This is an IDIQ type subcontract for Level-of-Effort (LOE) with fixed loaded ceiling labor rates, Cost-Plus-Fixed-Fee (CPFF) for Other Direct Costs (ODC's), and actual cost for travel . . .
>
> (f) In the event [PTP] fails to deliver the quantity of hours for the specified Level of Effort (LOE) in an awarded Task Order, [Defendants and PTP] agree to adjust the fixed-price values equal to the percentage of the LOE provided compared to the LOE contracted from [PTP] for the subject period.

Notably, interpreting the record in SAIC's favor, there are numerous facts showing that PTP's course of conduct was consistent with the parties' understanding that Task Order 6 did not obligate SAIC to allow PTP to deploy 44 FTEs. As early as May 2013, PTP was aware that the Army needed only 32 FTEs, and by October 2013, PTP's proposed manning rosters showed that PTP would deploy 27 FTEs throughout October 2013, 26 in November 2013, 24 in December 2013, and then 20 for the remainder of the base period of the task

order. PTP never objected to these lower numbers until after it learned that the option to extend Task Order 6 would not be exercised.

The record also suggests that PTP understood that the Army dictated how much labor was needed in Afghanistan. A reasonable jury could conclude that PTP knew when it signed Task Order 6 that its people would be deployed only if the Army ordered and authorized deployment. It is therefore **ORDERED AND ADJUDGED** that Plaintiff's Motion for Partial Summary Judgment As to the Issue of Liability of Defendants (Dkt. 52) is denied.

**DONE** and **ORDERED** in Tampa, Florida on December 3, 2015.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record

S:\Even\2014\14-cv-1356.msj-52-deny.wpd